May it please the court, James Daugherty from Washington DC for the petitioners. I'd like to turn directly to our chief NEPA argument, which is that the statement of purpose and need in the STB's EIS was inadequate. A number of purpose and need cases have been briefed. We think there are really only three that are relevant. Those are the Angoon case, the Citizens against Burlington case, and the National Parks Conservation case. Now the outcomes in these cases were mixed, but the rationale that emerges is fairly discernible. And that is when an agency is considering a big project like this and framing up the purposes of its EIS, it starts by looking at the purposes presented by the applicant. Then it considers any purposes that may be required or authorized by its organic laws. And then it strikes a balance. And if at the end of the day the balance leans heavily toward the applicant's purposes, that's okay. But what it can't do is just mindlessly adopt the applicant's purposes. And so on the spectrum of cases, where does this one fall? Nowhere near it. It's on another spectrum. This case is wholly unlike these other cases for this reason. The STB never actually articulated the purposes of this project. And if you look, I'll refer you to page 91 of Petitioner's excerpt, which is section 1.2 of the section on purpose and need. What it says is that the applicant has stated that the purposes of this rail line are to provide rail service to customers going to Port McKenzie. So what they do is they actually, in the form of hearsay actually, they say the applicant said that these are the purposes. So that doesn't pass muster in the NEPA. The other problem with this statement is that the purposes that it lay out there in that statement of purpose and need are false. It's really the cover story for this. The real purpose for this project was laid out in the letter that we filed electronically as an addendum to our excerpts. This is a letter dated June 27, 2011, at which the railroad in a communication to the board was addressing concerns that the Sierra Club had made about the environmental impacts of these shipments. They said maybe coal dust will be blowing off the coal shipments. In response to that, the railroad said, what shipments? As we look at it, we don't even see any customers out there. We don't see any shipments. We don't know what the volumes may be. The real reason we're building this railroad is because the municipality asked us to do so. And the municipality, the Matsu borough, has been very effective in raising tens of millions of dollars from the state legislature to pay for it. Counsel, Judge Gould, if I could ask you a question, please. Yes, Judge. Isn't there sort of a chicken and egg issue about, you know, whether they have goods to put, until you put the rail line to Port McKenzie on that side of the inlet, you wouldn't necessarily know what extractors of raw materials would get busy and could economically extract, you know, metals or forest products and ship them for export? I think not, based on my experience in other railroad cases. Typically, when an applicant goes to the SDB seeking for a license, there's a flood of letters of support from existing shippers or prospective shippers saying, we want to see this rail line because we want to ship coal or sorghum or ethanol or whatever. But in this proceeding, there were no such letters. In fact, the silence from prospective shippers was deafening. What this really is, according to their own letter, is really, it's a public works project advanced by the municipality. They'll get jobs. They'll get tax revenues and the rest. They've got state funding. And so there's no evidence that there'll be anyone using this line in the record. So here's the reasoning that we think should be used to resolve this issue. The SDB has argued that because of the constraints imposed on their decision-making discretion by the Organic Act, that they shouldn't have to do a full-blown EIS. They say that there's a presumption that they shall issue licenses. And that, therefore, why should an EIS? Why should they have to look at all these pie-in-the-sky alternatives? Well, there's a couple problems with that. One is that there really is no presumption for issuance. There's arguably a presumption for issuing licenses, but this is an exemption proceeding. This was initiated in section 105.02, and no one has ever said there's a presumption that exemptions should be issued. But more broadly, why should an EIS be constrained by an agency's Organic Act? Every regulatory agency has some set of statutes as follows, and they're all subject to NEPA. Why can't they comply with these dual statutory requirements fully, concurrently, and separately? The Supreme Court ruled in Vermont Yankee that NEPA is a procedural statute only. It doesn't impose substantive requirements on agencies. And so nothing in NEPA affects the way they make their regular statutory determinations. The reverse should be equally true. There's nothing in the STB's organic law that should require EISs to be constrained or hampered. The other problem with this reasoning is that with the STB's claim that it should only write half or limited EISs, because it assumes that the purpose of an EIS is to inform the agency's judgment. And that's only half true. The cases that we cite, the Scientist Institute case, the Calvert-Cliff case, and even this court's decision in Muckleshoot Tribe in 1999 say that every EIS has two purposes. One is to inform the agency's judgment, and the other is to inform the vast constituencies out there that are following this project and are involved in it. Like the public who will be affected by the project, like environmentalists who care about the grizzly bears, and the wolves, and the moose, and the spawning salmon, the wetlands, they have a right. The Alaska legislature, which is deciding whether to fund this project, they deserve to get unbiased, complete environmental information. And most importantly, as all the other federal agencies who are participating in this project, and in many cases issuing permits, they see the EIS as sort of the baseline data set for their permitting decisions. And that may explain why, during the EIS process, the other agencies hammered on the STB continually for the inadequacies in its statement of purpose and needs. Counsel, I'm pretty familiar with this, with the Service Transportation Board and railroads in the north. I wrote the Northern Plains case, which dealt with some issues where they clearly did blow it, in part. But the NEPA, as you pointed out, is not a statute that is, it's not a substantive statute. It's designed to make certain that everybody has all of the relevant material, environmental considerations on the table, that they are addressed by the agency, in this case, the STB. And if there's a disagreement, then the agency is entitled to deference, unless they violated the law or they clearly don't have reasoning that backs it up and so on. So that's a very simplistic summary. But I guess what I struggle with on this is, even your own argument, you point out that there were a lot of people who objected, for example, to that there were, about the quantities the railroad was going to be shipping. Commissioner Mulvey being an example here. But it kind of looks to me like, muddled though it may have been, inartfully done, it looks like they got these issues out. And people, you know, there was comments and responses, and they got it discussed. What would you point to, at least for my benefit, what is the most important thing that they omitted or just flat out got wrong that under lands council and other cases would require us to say that NEPA was not fulfilled in this case? Well, I'll agree with you on one thing, Judge Smith. There was a lot of paper flying for about a year and a quarter. So that was accomplished. Yeah. The biggest flaw that we see in the purpose of need statement, there are actually two flaws. One is there's a clear requirement that the agency take accountability for the purposes of the project. All the cases. Forgive me. What does that mean in real terms? I mean, the concept is an attractive one. But what does that mean in this case? What did they not take accountability for under the law? Well, what they should have said was, we are considering this license decision, and here's what it will accomplish. And instead, they provided hearsay as what the applicant said that it hoped to accomplish. Well, yeah. I understand that. And I guess what I'm struggling with here is that in almost every, well, take the one that we had in Montana. Very similar situation. The railroad, they tried different things. Some worked, some didn't work. And they said, this is what we want to accomplish. These are our estimates about what amount of coal is going to be there and all that sort of thing. But there's a lot of hearsay that comes into NEPA considerations. It's inevitable. The question, as I understand it, and I appreciate your correction if I'm wrong, is did the agency, in this case the STB, take what was said, take what you said, take what Commissioner Mulvaney, take what everybody else had to say, analyze it, and point out if, in fact, if they said, this is the purpose of it, and it turned out that that was totally unlawful, they didn't deal with it, or they misrepresented what was done, that's another matter. But just the fact that it's hearsay, at least based on my understanding of the law, does not in and of itself mean that they have not complied with NEPA, provided that they grapple with what they're talking about. And clearly, there were a lot of people who were objecting. You all did a great job, and you had lots of stuff here and there. Tell them all the things they did wrong. Are you saying that they didn't take what you said and grapple with it? Yeah, let me answer your question this way. They fundamentally misconstrued what was going on here. What they said was that this is about meeting a demand for rail service from the port into the interior of Alaska. OK, so you're saying they just flat out misrepresented. Yes, and that's proven in the letter I'm citing, in which the railroad said, we don't know if there is any business here. They're not in this for profit. It's a public works project. And if that had been disclosed, that would change everything. In the minds of a lot of people, this project, with its enormous environmental damage. Did that come after the NEPA alleged compliance? After the documents finalized, but long before they reached their decision. So you're saying they knew this, but the public didn't know it until later. And do you have anything in the documentation that shows that, other than your supposition based upon what the letter later said? No, well, I will say this. In our opening brief, we cited extensive information in the record showing that this project would not survive any reasonable financial. Yeah, like I said, that's what I saw. And that was the most important thing. And at the end of the process, we had the confirmation with the railroad that they didn't have any customers. In addition to the statement, this is mostly a public works project pushed by the county. Now, what we don't know is, why is the borough pushing this? Is someone pushing them? It could be like a daisy chain of finger pointing as to who's really driving this. But none of that's apparent to the public. But from an environmental perspective, if the SDV gets information from you, and there's a commissioner that is objecting and so on, and saying the very things you're talking about, this is not going to survive. It's not going to work. And that is weighed. That's considered. Haven't the objectives, the primary objectives of NEPA been satisfied? Well, I suppose in your hypothetical. But that's not what happened here. OK, tell me what I'm missing. They did not disclose that this was a financially dubious proposition. But you did. Well, a number of people did. But they discredited that. OK, well, that's lands council, isn't it? Don't they have the right under lands council to say, OK, here's what these folks say. Here's what these folks say. Here's what these folks say. And in our judgment, that's not enough. We're going to move forward. Well, but their discretion to make those judgments is not unbounded, particularly when the evidence is coming not from the critics of the project, but from the railroad itself. The railroad knows better than anyone if this project is viable or not. And they said no. They don't see any customers out there. They said that during the process or after the process? They said it at, well, I don't know. We have proof that they said it afterwards. Whether or not that was transmitted, we don't know. So you don't know that the STB had information from the railroad that said, you know, we're just lying to you. We don't really need to do this. It's just a public works thing. You're supposing, and I don't know one way or another, you're supposing that the letter that you got afterwards was, that information was known to the STB. But as I understand it, you have no current proof in the record that, in fact, it did know that and that what it said in the documentation is false. Well, it was certainly cited and discussed by dissenting Commissioner Mulvey. Right. He knew it. They all knew it. It was received well in advance of that lengthy memo from the Office of Environmental Assessment. Right. But it was clearly discussed, clearly weighed, and ultimately, they determined to go forward. Right. And they decided to go forward, and they decided to grant an exemption. Right. Exactly. Right. Let me turn to that, if I might. We think that their decision to exempt this project was wrong in terms of both the result they reached and the way in which they reached it. Unlike the full licensing provision, 10901, when they are considering an exemption, they follow a list of 15 criteria under Section 105.02. And in the cases that we cite in our reply brief from the DC Circuit, the Illinois Commerce Commission case and the Coal Exporters Association case, the DC Circuit, on review of their decisions to grant exemptions, runs them through the judicial ringer. They demand all the explanations and citations of the record. It's a full-blown APA kind of review. And when the court found that they either didn't make sense in their reasoning or overlooked relevant criteria, they remanded. What happened here was that in four sentences, the board said, oh, yeah, this is exempt. Criteria 2, criteria 4, criteria 5, criteria 7, case closed. And some of their findings defy credulity. For example, they invoked criterion 7, which says you should issue one of these exemptions where it will lower barriers to entry into or exit from the industry, okay, the railroad industry. Now, the context here is that this railroad is a monopoly. So how could it be reasonably argued that allowing it to build a rail spur down to the port will lower barriers to entry into the industry? To us, it makes no sense on its face. No explanation was required, nor were there any citations to the record. So we just think honestly. You're welcome to continue on, but you said you wanted to reserve four minutes. You're down into the three minutes. Do you want to reserve that now, or do you want to go forward at this time? I think I'll stand on that. Thank you. Okay, very good. So we'll hear from you again in a moment. And we'll hear from the STP. Just to make certain I understand, I see that Mr. You're Mr. Hunt, right? Right. Is Mr. Johnson also going to be speaking? Yes, Mr. Johnson's going to speak on behalf of the intervenors for five minutes. Okay, very good. So you're going to do, you have 15, he's got five, right? Fifteen minutes, that's correct. Good, okay. Please proceed. May it please the court. Ted Hunt on behalf of the Surface Transportation Board and the United States. With me at council table today is Jay Johnson representing Intervenors Alaska Railroad in Mat-Su-Burro and Sean Lynch from the Alaska Attorney General's Office representing the state of Alaska. I'd like to begin by addressing some of the brand new arguments that Mr. Daugherty just presented to the court. These were no way, no shape, way, shape or form ever in their briefing. They say that we misrep, that the board misrepresented the purpose and need of this project. They never said that in any of their briefing. They say that we didn't do a full blown EIS. That is ridiculous. We spent three years and did a, a massive EIS on this project. Now, now let's get to the purpose, the actual purpose and need arguments that they've, they've made here. The purpose and need statement in this case is fully compliant with NEPA and the CEQ regulations. The board did not just adopt the purpose and need stated by the applicant, which is this, the Alaska Railroad. It also, two pages right after that, right in its purpose and need chapter, specifically explains the, the two statutory provisions that are at issue here, 10-502 and 10-901, and how they, they, they apply and how they are to be applied in this case. That's what the board did. And that is entirely consistent with the National Parks case from this circuit and Busey from, from the D, the D.C. circuit. In those cases, the court said, you cannot just adopt the purpose and need of the applicant. You must discuss the statutory and regulatory framework that, that is gonna ha, apply to this case. That's all we can, the board can do, because the board is a licensing agency here. This is not our project. We are not funding it. We are not sponsoring it. We are not, this is not a land swap like, like the National Parks case. So we do not have an independent interest in this case. Therefore, that you have to start with the interest that the applicant presents. To say that this is misrepresent, it, it was misrepresented, excuse me, misrepresented to us, that is not correct. What the purpose and need of this project is, is clearly stated in, in the EIS as providing service from the Port McKenzie, a deep water port, a 60 foot draft deep water port that has no rail service and only has truck service, to provide service to that, so that they can hand, they have an existing bulk materials facility there. And this is, this is going to allow train traffic to, to reach that port. They projected two trains a day based upon their, their excuse me, their application and their EIS. This is Alaska Railroad. Alaska Railroad did. They, they based it upon their earlier trip traffic at this working port, ship, excuse me, ship traffic at this working port, and their expectations for future traffic. And I think Judge Gould got it exactly right in that there is a chicken and egg issue here. And that you cannot have a, a, a rail, a port without rail and expect their traffic to increase for these types of giant shifts and to handle the bulk materials that come in. You need to have rail. And that's what the courts, I mean, excuse me, the board specifically explained in their purpose and need statement. This is entirely consistent with CEQ regulations as well. Where the, where the CEQ regulations at 40 CFR 1502.13 say the agency is supposed to state the purpose and need of the project and as the purpose and need that they are responding to. And that, and that is consistent and basically shows that, look, there may be projects that aren't agency projects. We have to respond to it by what the applicant's purpose and need is. Now, what, what the petitioners would like to do in this case is they would like to stand NEPA on its head. They would like the, the STB to put a substantive standard on the purpose and need statement and say at the outset of the EIS that this project is meritorious or it's not meritorious. It's questionable or it's not questionable, or it's environmentally beneficial or it's not environmentally beneficial. That has no, that has no precedent, there's no precedent for that, for that argument whatsoever. NEPA is a, is a procedural statute. It does not require substantive evaluations of the purpose and need statement. Now, what I find very interesting is that, that this also flies in the face of the entire NEPA procedure. The, the purpose of doing the EIS is to, once, once the, the application, in this case it's a petition for exemption, comes to the agency, the agency then accepts that application, says we're going to, this is the major Federal action right now that's triggering our, our EIS process. The EIS is then done and at the end of that process, that's when the decision maker, which is in this case the Board, decides whether to approve or not approve this project, whether it's meritorious or not. And in this case, as, as in every other rail exemption case, the Board at the end of its decision, on page 19 and 20 here, discusses the environmental impacts here, discusses the mitigation involved, and then weighs those environmental impacts as mitigated with the transportation merits. That's when you're supposed to do that weighing. That's when you're supposed to do that, the, the, the substantive determination of whether the project should be, should go forward. Not at the beginning of the process. You cannot come, have an applicant come to you and, and, and prejudge it and say, well, we don't believe that you're, you're talking, you're speaking truthfully to us. So I, I, I, the purpose of this statement here fully satisfies NEPA. It's entirely consistent with National Parks and with the BUC case. I think it's, it's just outrageous that counsel's coming here and now making these claims about misrepresentation, everything else that's not in their brief. They filed a 28-J letter yesterday while I was on the plane. Didn't even tell me if they filed it when they saw me today. And then they, they essentially argued that this, that this is new evidence. This is evidence that, from a letter that existed last summer. So how is it appropriate for you to be in a 28-J letter? Just not. Getting to the, the other issues involved here, the, on the NEPA context, there's two other issues. There's the access road issue that they claim, and then the wetlands analysis. The board reasonably here found that an access road was not, was a necessary part of a modern rail line. And it was needed for not just construction, but also maintenance and safety issues. When, if there's a derailment in the future, you need to have an access road. And this is how modern railroads are built. And we are the agency that approves these, these applications. We are entitled to deference on this determination. They say we just ignored EPA's comments and we blew them off. Absolutely not true. We listened to their, their comments. We explained why they, that we do not agree. And we put that in our EIS. That is all that NEPA requires. With regards to the wetlands analysis in this case, that was also a thorough, hard look at all, at the wetlands impacts. We used approved, the Corps of Engineers, the Army Corps of Engineers, which is the agency that, that has jurisdiction over wetlands issues, approved our methodologies as to how we're going to delineate these wetlands. We delineated it by acreage, by type, by functionality for all 12 rail build alternatives. Oh, that reminds me, one other thing on the purpose and needs statement. The purpose of the purpose and needs statement is to inform the range of alternatives. That's what this Court has said many times. And they don't identify any alternatives that we missed. Nothing. They don't even, and if they just say the access road, well, that's, that was rejected on a technical issue. So the purpose of the purpose and needs statement is to inform the range of alternatives. Now, with regard to the comments we received on the wetlands, we did receive comments from EPA and other agencies saying that more delineation might be needed, but that when you read the comments, they're in the context of the 404 process under the Clean Water Act, that the Corps has to issue a permit for this project, and that the Corps itself and EPA said there might be initial delineation that might need to be done for this project  But that's a substantive standard under the Clean Water Act, which is the LEDPA, which is the Least Environmentally Damaging Practical Alternative that has to be met. So that's a substantive standard. And this Court has recognized in the city of Carmel by the Sea Case that there may be, when you have to have an EIS process and a Corps permit at the same time, there may be additional work that the Corps needs to do afterwards because they have to meet that tougher substantive standard under NEPA's more procedural statute. That doesn't mean that we did not take a hard look at the wetlands' impacts. The same thing goes for the mitigation measures. We discussed reasonable mitigation measures to a reasonable degree. There's at least eight of them listed in our brief talking. We required natural flows to be maintained, compensatory mitigation with at least a one-to-one ratio, which actually turned out when the Corps issued the permit, they pushed it up, and it's now one-to-one-and-a-half at least. The petitioners in this case have sued the Corps, not surprisingly, on that permit, and that's before the district court in Alaska. Getting to the Interstate Commerce Act arguments that petitioners now have addressed today, the board, first of all, the Interstate Commerce Act are not even properly before this Court. The petitioners or nobody else raised any Interstate Commerce Act arguments with the board. And that is why when they say, oh, we only the board only took four sentences, that's because nobody submitted any comments to the board challenging the use of the 10-502 exemption procedure, which is required by Congress. They told us we have to exempt projects if they meet the criteria. We shall exempt them to the maximum extent possible. We don't have discretion to say, no, no, we're not going to take an exemption petition. And but nobody ever argued any of these issues before us. Nobody came to us and said that we need to use 10-901 or that the RTP provisions that we have to look at are this and that or these other provisions. The applicant in this case, and petitioners were well aware, filed a 10-502 exemption petition. In that petition, they specifically discussed which rail transportation policy RTP provisions they thought were applicable. Petitioners and everyone else sat on their hands for three years. This was an exemption petition. It was intended to be a quick process, but because we do a full EIS, it takes a long time. And at no point in any time, in those three years, did anyone come to us and say, we don't think that the, that these are the right RTP provisions or you should be applying these or those. They said it's an investigatory proceeding. It's not. It's just like a court. You have to file things on the record and the board decides and issues a decision. They point to the, they point actually to our rail exemption procedures, but they don't prohibit commenting on rail exemptions. They just say that we don't, the board doesn't actively solicit comments. What they do is, but you can submit comments and the board says it may consider them at the time. That's what that regulation says, 1121.4. With regard to the actual weighing of the Interstate Commerce Act provisions, the board did a very thorough job of looking at what was presented and saying how it met the relevant RTP provisions, which in this case are really provisions 4 and 5, which talk about the sound transportation system and enhancing transportation and, at the same time, enhancing competition. When Mr. Dougherty gets up and says, well, RTP provision 7 doesn't make any sense when you apply it here, it's actually belied by the one case that they cite in their reply brief. They cited no cases in their initial brief on these issues to support their arguments. In their reply brief, they cited two, one of them is the Illinois Commerce case. And in that case, it actually says that, it's a D.C. Circuit case, it interprets the industry does not mean just the industry as a whole. It can mean an individual line. That case involved an abandonment. It wasn't a construction, but the same principle holds. And that's what the board said, was by adding another line and doing it through an exemption, you are removing a barrier to entry to allow that to the court. So in sum, unless the Court has other questions, I believe that the Respondent's perspective requests that the Petition 4 review be denied. Roberts. Any questions? I have no questions. Sure. All very well. We'll hear then from Mr. Johnson, right? Good morning. May it please the Court, my name is Jay Johnson. And I'm here representing the Intervenor Respondents, Alaska Railroad Corporation and the Madagascar-Susitna Borough. I'd like to begin, I think, with the new argument that's been presented this morning. And that was for reasons that are- that the arguments that were made this morning by the environmental group were entirely new? Or just some of them? Oh, not all of them were completely new, but there were quite a few new ones. And I think it's a pattern. Your Honors, I would point you to the excerpt of record that we filed on page 25. It is, you will see, the letter that was filed as a 28-J last night. As if it were something new. It's, in fact, in our excerpts of record, it's from June of 2011. It's from our law firm. And I'm happy to discuss the letter. I think it says nothing whatsoever like what the other side is now claiming for the first time that it says. Sounds like there's not good feeling between this group and the other group. You guys all pack up in Alaska, too. You got to be careful. Yeah. Well, I mean, I'm not trying to convey any bad feelings. I'm a little taken aback by what's been said this morning. But let me just turn to the particular paragraph since it seems to be an important issue now. It's a paragraph on page IE 32 in our record. And it explains, in the context of responding to comments about coal dust, that, in fact, we don't know at this time what commodities are going to be shipped. Citing the final EIS, which is clear about that point. And then it explains in the next sentence that there are a number of different commodities that may be shipped on this line. Again, citing the EIS, which, again, is clear on this point. And then there's a sentence. That's your letter, counsel? Yes, Your Honor. Does the letter anywhere say, if we build it, they will come? No, it does not say that, in fact. But the record is replete with studies and discussions of commodities that we expect fully to be developed when the rail line is constructed. At present, some commodities do come by truck, which, as Your Honor, as I'm sure know, is a much less practical means of taking large amounts of bulk materials to a port that, in fact, exists and has shipped out bulk materials and received materials. And that's where the next sentence of the paragraph comes in. This is in no way saying, oh, it's a public works project. It says, because the borough, which operates the port, has requested that ARC provide rail service, ARC being the railroad, is responding to the needs of a customer in constructing the proposed rail line extension. Opposing counsel says, oh, there's no letters from potential shippers. The borough is a potential shipper. The borough is sponsoring the project. And this sentence means the borough wants rail service. That is why the line is being built. And under NEPA, does it make any difference as long as it's fully disclosed and weighed? No. And I think that's exactly right, and as Mr. Hunt said, the purpose and need statement is intended to delineate the alternatives. If there's criticism of the purpose and need statement, such as in the cases where the purpose and need statements are found adequate, inadequate, it's because they lead to a narrowing of the alternatives that's improper. When there's no question about the proper study of alternatives, there really shouldn't be that much inquiry into the purpose and need statement. And again, just to return to the theme of new arguments, I do think that the purpose we saw new arguments in the opening brief. Our position is that those have been waived, that being the arguments regarding 10-502 and whether the board appropriately took into account the rail transportation policy. That was brand new material. Now there's brand new material again this morning. I think it's appropriate for the court to consider the briefs, to consider the arguments that have been made over the course of years in this case, to consider the EIS, which is an incredibly thorough and well-done document, and to approve the board's decision. So from the railroad's perspective, and I'm sure from the service transportation board's perspective, each of the arguments that's been legitimately raised on appeal by the board are being looked at and answered in full. Is that your position? Absolutely in full and it's all in the record. I invite the court to read the excerpts of record from 25 that we filed. That letter is responding to comments that were filed after the final EIS. And the board asked the railroad and the borough to give their responses. They did. That led to a supplemental environmental statement, which is appended to the board's decision. The board left no stone unturned. When any stone was pointed to, the board looked under it and found what it found, and all of that information is available in the EIS and in the record. So for all of these reasons, unless there are further questions, Your Honors. Any questions, colleagues? No, thank you very much. We would ask that you not only uphold the board's decision, but if you are inclined to uphold the board's decision, lift the emergency stay that was imposed by the motions panel. Very good. All right. We'll hear now a rebuttal from Alaska Survival. I find myself on the defense here. Let's talk about this letter first. Our understanding is that the only documents that went to the court were those that were contained in our excerpts. We wanted to mention this letter, and we were under the mistaken apprehension that it was not in anyone's excerpts. And I didn't want to talk about a letter here that you didn't have a chance to see. So we just wanted to make sure that the court had a chance to see it. This was not- Do you acknowledge now that it is in their record, in their excerpt? I certainly accept his representation, but if that's the case, why are they upset? It was already there in front of the court. Why are they upset that we just put it in for a second time? There's no harm done. I just am completely baffled by the frustration. Their position also is that the other points that you made, some of them, I gather, coming up in the reply brief were all new. Is there any thoughts on that? Well, they'd have to be more specific. In our opening brief, we made the point there is no justification for this project, and we cited all the record evidence that it's a money loser. And so to say this has come up for the first time is a surprise to me. And I will also mention that this letter and its contents were discussed by this dissenting Judge Mulvey in the order. So it's something that's in front of all the parties. I see nothing new here. Now, again, our point has been the most – I must – I should just say, just for at least my own purposes, I – it's very clear that the counsel for the STB and the railroad are pretty upset. I take their upset as being genuine. They feel like they've been a little sandbagged here. I don't know if there's any truth to any of it. But I will simply say to you and any litigants that the Court expects that the parties will all follow the rules, that they will treat each other with respect, that they will give appropriate deference to anything that has already been played. I'm not saying that anything has been done wrong here, but it's troubling when we see what seems to be pretty upset folks on the basis they think they've been sandbagged. So whether it's true or not, I don't know. But just keep that in mind. That's not helpful, certainly to me, and I'm sure my colleagues feel very much the same way. Well, Judge Smith, I hope that you pay more attention to what's true than to the emotionality that may have been expressed. I try very much to see what's true. Very much. I've been practicing law for 35 years. And as an officer of the Court, I have always tried to adhere to the highest standards of professionalism and fair play. And I think that's been true of my relations with these lawyers. I've frequently given long advance notice before we sought to stay and consulted with them and showed all our cards at every step, far more than was required by any standard of ethics. I accept that. I was speaking in a rather general way. But just for everybody to kind of keep that in mind, that's important to the Court. As to whether this project is mostly a for-profit enterprise trying to respond to existing demand or whether it's a public works project, the chief argument we just heard was that the demand is coming from the borough. The borough wants the rail line. Well, the borough is a government. It's a municipal government. And they may be operating the port. Perhaps they're buying their ice melt via train. But they are not a shipper. They are not an exporter of either coal or these other materials. But if they own the bulk facility that somebody told us. Well, they may have some. They own the port. Yeah, they have the facility. They're not sending stuff. They're handling it. The port's more successful if it has that railroad capability, though, isn't it? It makes that greater likelihood that the borough's shipping facilities will be successful. What's missing are companies with money who want to pay to transport their goods. That's what's not there. Finally. Oh, five seconds. Actually, you're over time. So thank you very much. Thank you very much, both of you, three of you, for your arguments. The case disargued is submitted. And the Court stands in recess for the day.
judges: Duffy, Gould, Smith